UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION

GREGORY E. ALLEN,                    )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )        CAUSE NO. 3:12-CV-208-JED
                                     )
CAROLYN W. COLVIN, Commissioner      )
of Social Security,                  )
                                     )
        Defendant.                   )

**OPINION & ORDER**

Plaintiff Gregory E. Allen ("Allen") filed a complaint on March 26, 2012 [DE 1],

seeking review of the final decision of the Defendant, the Commissioner of Social

Security ("Commissioner"),[1] denying his application for benefits.  With the filing of the

opening brief [DE 10], response brief [DE 14], and reply brief [DE 15], this matter is ripe

for a decision.

Relevant to this appeal, Allen initiated administrative proceedings by filing an

application for Supplemental Security Income ("SSI") on March 16, 2009, alleging a

disability onset date of February 17, 2006 [DE 1 at 2; DE 8 at 136-38].  Allen's

application was denied initially on September 16, 2009, and upon reconsideration on

February 23, 2010, after which he requested a hearing [DE 8 at 69-72, 79-83].

Administrative Law Judge ("ALJ") John H. Pleuss conducted a hearing on October 19,

2010 [DE 8 at 35-62].  Allen was represented by counsel, and the ALJ heard testimony

---

[1] Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), Colvin is substituted for Michael J. Astrue as the Defendant in this action.  No further action needs to be taken as a result of this substitution. 42 U.S.C. § 405(g) ("[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

from Allen [DE 8 at 36–54] and Vocational Expert ("VE") Paul Malucci [DE 8 at 54–58].  On October 29, 2010, the ALJ issued a decision concluding that Allen was not disabled under the meaning of the Social Security Act because he retained the residual functioning capacity ("RFC")[2] to perform past relevant work as a telemarketer.  *Id*. at 14–20.

Allen filed a request for review to the Appeals Council.  *Id*. at 9.  The Appeals Council denied the request for review on January 23, 2012, making the ALJ's opinion the final decision of the Commissioner.  *Id*. at 4–6.  On March 26, 2012, Allen filed a complaint, which was transferred to this Court, seeking judicial review of the Commissioner's final decision [DE 1].  Jurisdiction is established pursuant to 42 U.S.C. § 405(g).

## BACKGROUND

Allen was 55 years old at the time he applied for SSI benefits and he became eligible for SSI benefits the month following March 2009, consistent with 20 C.F.R. §§ 416.202(g), 416.501 [DE 16, 136-38].  His amended onset date for disability was July 17, 2008 [DE 8 at 38], and Allen alleges disability mainly as a result of type II diabetes and its resulting symptoms.  *Id*. at 48.  He was diagnosed with diabetes approximately eight years before his hearing, and had been treating his diabetes with insulin injections ever since.  *Id*.  He frequently has high readings for his blood sugar and as a result, he suffers from blurred vision, frequent urination, and fatigue.  *Id*. at 53.  He also experiences sharp shooting pains and numbness in his feet and the fingers on his left hand.  *Id*. at 54.  In addition, he suffers from lower back pain.  *Id*. at 54–55.

---

[2] Residual Functional Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 416.945(a)(1).

2

A.      **Medical Evidence**

Allen was first diagnosed with type II diabetes on December 31, 2003 [DE 8 at 275].  He was visiting an Urgent Care Center for dry mouth and frequent urination, when his blood sugar was tested and he was found to have a glucose level of 582.  *Id*.  He was given IV insulin therapy and then released once his blood sugar levels normalized.  *Id*.  He attended a follow-up appointment at the clinic in January of 2004.  *Id*.  It was reported that his blood sugar levels were much better with insulin treatment.  *Id*.  That month he also had an eye exam which reported no findings of retinopathy.  *Id*.  He was advised to follow-up in 5-6 months and have an ophthalmologic examination conducted. *Id*.

Allen visited the Dean Medical Center for diabetes check-ups on April 18, 2005 and May 21, 2005, and during the later visit his glucose registered at 275 [DE 8 at 273-75].  Doctor Bernstein characterized his diabetes as poorly controlled and recommended a better diet.  *Id*.  He also increased Allen's medication.  *Id*.

Then in October of 2005, Allen was hospitalized at St. Mary's Hospital [DE 8 at 243–54; 267-71].  He was admitted to the hospital after his urine showed a significant amount of glucosuria.  *Id*. at 243.  His initial blood glucose was 1016 and there was no evidence of acidosis.  *Id*.  He was given fluids and insulin intravenously and slowly his blood sugars resolved.  *Id*.  At the time of his hospital stay, Allen complained of numbness and tingling in his lower extremities, increased thirst, and polyuria.  *Id*. at 245. The doctor concluded that Allen was experiencing hyperglycemia as a result of noncompliance with his medication.  *Id*.  Allen was released from the hospital two days later with a blood sugar reading of 194.  *Id*. at 251.  He was expected to follow-up in late November. *Id*. at 267.

Allen's medical records reveal that it wasn't until May 25, 2007, when Allen reported to Dean Medical Center for a check-up for his type II diabetes [DE 8 at 263–66]. He was given a new glucometer and told to check his sugar levels three or four times each day. *Id*. at 263-64. The doctor counseled him on the importance of using insulin, noted that Allen demonstrated a poor understanding of his needed care, and advised him to follow-up in 3 months. *Id*. Then, on September 28, 2007, Allen again visited St. Mary's Emergency Room for high glucose levels. *Id*. at 240–42. His glucose was measured with a result of 186 and he was released. *Id*. at 242.

Not until February 4, 2009, did Allen return to Dean Medical Center for a check-up on his diabetes [DE 8 at 259–63, 293–97]. Allen also complained of blurry vision, increased thirst, dry and calloused feet, and increased urination. *Id*. at 259-60, 294. It was noted that he had no medical insurance, no job, and no glucometer, and his capillary blood sugar tested at 406. *Id*. The doctor recommended that Allen wait until his blood sugar levels improved to schedule an eye exam. *Id*. The doctor also recommended that Allen soak his feet and use a pumice stone to remove his callouses. *Id*. at 294.

On July 29, 2009, Allen had another check-up with Dean Medical Center. *Id*. at 287–92; 327-31. It was noted that Allen stopped in frequently to obtain samples of insulin and that he continued to be unemployed without any medical insurance and declined lab work again due to financial reasons. *Id*. Allen presented with complaints of poor vision, numb feet and sharp pain. *Id*. The doctor gave Allen sample medication for his diabetes and advised Allen to schedule an eye exam to help diagnose his continued blurry vision. *Id*. at 290.

On August 5, 2009, Allen visited the Dean Medical Center for an eye exam [DE 8 at 286–87, 303–05].  The doctor found no evidence of diabetic retinopathy.  *Id*. at 303. The doctor also found no diabetic anatomical abnormalities and believed that the blurred vision was a direct result of uncontrolled blood sugar levels.  *Id*.  It was noted that "the disc was mildly suspicious for glaucoma" in both eyes.  *Id*.  Dr. Kadell was "uncertain why his sugars [were] so difficult to control" and opined that if Allen could regulate his blood sugar levels, his vision could be controlled.  *Id*.

On September 15, 2009, Allen met with state agent Dr. Chan [DE 8 at 307]. Allen complained of blurred vision, numbness in his feet, fatigue, and poor energy levels. *Id*.  Allen stated he could only sit for one hour at a time, stand for one hour at a time, and walk for fifteen minutes at a time.  *Id*.  Dr. Chan found Allen to be partially credible and opined that the medical evidence did not indicate such a severe limitation that Allen was unable to perform activities of daily living. *Id*. Dr. Chan also believed that there was no evidence of a severe impairment.  *Id*.

On February 2, 2010, Allen had a consultative examination with Dr. Midthun at Dean Medical Center [DE 8 at 309–11].  During that visit Allen complained of high blood sugar levels, tingling or numbness in his left hand, fatigue, lower back pain, decreased ability to hear, and progressive dyspnea with exertion.  *Id*. at 309–10.  Allen also complained of trouble sleeping as a result of the fear of amputation.  *Id*. at 309.  Dr. Midthun reported that Allen suffered from progressive neuropathy of both feet for the last two or three years, especially in his toes and the bottom of the feet.  *Id*.  The top of Allen's feet also did not have much sensation.  *Id*.  Allen could not vacuum one room without needing to stop.  *Id*.  He also had a productive cough, and complained of some

tightness in the chest.  *Id*.  Allen told the doctor that he could not lift more than twelve or fifteen pounds at a time, stand without leaning on something for more than a few minutes at a time, and sit for more than fifteen or twenty minutes at a time due to his back problems [DE 8 at 310].

Dr. Midthun found that Allen did have trouble with balance, squatting, sleep disturbance, risk of injury due to lack of feeling in his extremities, lack of feeling in his left hand, shortness of breath, decreased hearing, and fatigue, possibly due to a history of hepatitis C.  *Id*. at 311.  The doctor found no evidence of radiculopathy.  *Id*.  However, the doctor did find some evidence of an early degenerative change in Allen's left hip.  *Id*. Dr. Midthun believed that Allen's back problems were likely due to repetitive/heavy lifting, repetitive bending/twisting, and prolonged postures.  *Id*.  Dr. Midthun found that Allen would have difficulty with soft sounds and background noise, and noted he had trouble filling out the forms due to poor vision even with corrective lenses.  *Id*.  The doctor believed that Allen's hearing problems were likely based on his family history.  *Id*.

On February 19, 2010, state agent Dr. Khorshidi conducted a Physical RFC Assessment [DE 8 at 312–19].  The doctor found that Allen was capable of occasionally lifting/carrying up to ten pounds and frequently lifting/carrying less than ten pounds.  *Id*. at 313.  Allen could stand and/or walk at a normal pace for at least two hours in an eight-hour workday.  *Id*.  Allen could sit with normal breaks for about six hours in an eight-hour workday.  *Id*.  Allen could push/pull in an unlimited capacity, occasionally climb ramps/stairs/ladders/ropes/scaffolds, and he could only occasionally balance due to his neuropathy.  *Id*. at 314.  The form failed to indicate whether Allen had any limitations with respect to stooping, kneeling, crouching, and crawling. *Id*.  The doctor found no

manipulative limitations, no visual limitations, and no communicative limitations [DE 8 at 315–16]. It was determined that Allen should avoid concentrated exposure to fumes, odors, dusts, gases, and areas with poor ventilation, as well as exposure to hazards such as machinery and heights due to his neuropathy and reported shortness of breath. *Id*. Based on Dr. Khorshidi's review of the medical records, he confirmed that Allen had decreased sensation in his feet and some problems with balance, no evidence of diabetic retinopathy, but did believe that Allen's vision would be better controlled with better control of his blood sugar levels. *Id*. The doctor noted that Allen did not seem to be limited by his fatigue and that he was able to care for himself independently. *Id*. Dr. Khorshidi found Allen's statements of functional limitations to be credible, and believed that Allen was capable of sedentary work with limited exposure to gas, dust, fumes, heights, and hazards. *Id*. In addition, Dr. Khorshidi believed that Allen was capable of performing his past job as a telemarketer at Xentel. *Id*.

Finally, on February 23, 2010, Allen visited the Dean Medical Center for a check-up on his type II diabetes [DE 8 at 321–23]. The doctor noted that Allen's diabetes continued to be a problem because of his lack of medical insurance and inability to afford medication that would help regulate his blood sugar levels. *Id*. at 321. The doctor found no indication of a problem with hypoglycemia. *Id*. at 322. Allen complained of discomfort, similar to numbness, but with a deep internal pain in his calf muscle which caused difficulty walking. *Id*. Allen also complained of chest pain when performing daily activities, such as shoveling snow. *Id*. The doctor increased Allen's medication for his diabetes mellitus and recommended a stress test for the chest pain. *Id*. Due to Allen's lack of insurance and finances, he declined additional testing and lab work. *Id*.

**B.      The Administrative Hearing**

   *1.      Testimony of the Claimant*

The ALJ conducted a hearing on Allen's benefits application on October 19, 2010.  [DE 8 at 35–62].  Allen testified at the hearing, as did a VE.  *Id*.  Allen testified that he had two children and that he was homeless, but would stay with a couple of different friends.  *Id*.  He stated that he had no income at the time, he weighed between 215 and 220 pounds, and he did not have a driver's license.  *Id*. at 39-40.  He testified that he had a GED and approximately one year of college at the University of Wisconsin. *Id*.

Allen then described his work history [DE 8 at 40–47].  Allen testified that in approximately 2005 he worked for the City of Madison in the forestry section of the parks department.  *Id*. at 43-44.  He worked there for approximately one year driving a truck and collecting brush from trees that had been trimmed.  *Id*.  He had to lift shovels that weighed approximately thirty to forty pounds.  *Id*. at 46.  In the last ten years, Allen stated he worked at Dunham Express for approximately one year picking up and delivering light parcels, which also required some heavy lifting.  *Id*. at 45.  The parcels weighed approximately fifty pounds each.  *Id*. at 46.  In addition, Allen worked at the Department of Transportation for approximately one and one half years as a laborer that drilled for a new highway.  *Id*. at 45. He had to lift/carry up to one hundred pound items. *Id*.

Most recently, Allen worked at Xentel for a couple of months in 2006, and then for a year ending in March of 2008 [DE 8 at 41].  At Xentel he was a telemarketer.  *Id*. After about a week of training, he sat in a cubicle in front of a monitor making

solicitation phone calls for charities.  *Id*. at 41, 47.  He did not stand or walk around much at this position.  *Id*. at 42. Allen was ultimately terminated from his position because he had difficulties concentrating and reading the script on the monitor.  *Id*. at 42–43.  After being fired from this job, Allen testified that he did not work again, although he applied for employment at other places.  *Id*. at 43.

Allen then testified that he did not work from the period of 1997 to 2005 because of a problem with marijuana and cocaine.  *Id*. at 47-48.  Allen has since overcome his drug problem.  *Id*. at 47.  He further testified that he has no history of a drinking problem. *Id*.

Finally, Allen gave a detailed history of his diabetes [DE 8 at 48–57].  He testified that he was diagnosed with type II diabetes approximately eight years prior to the hearing.  *Id*. at 48.  He began injecting insulin right away to treat his blood sugar levels and still used injections as a method of treatment.  *Id*.  He testified that he injects Humalog four times per day and NPH twice daily with a flex pen.[3]  *Id*. at 49.  After being approved for a Lilly program in September 2010, he began receiving his insulin and medical supplies for free.  *Id*. at 50.  Before that, he would use free samples from doctors and pharmaceutical companies. *Id*.

Allen testified that even today he has high blood sugar readings, and in the last year or two his blood sugar levels (which are tested approximately four times each day) generally range from 200 to 250 [DE 8 at 51-51].  He noted that he struggled with eating a proper diet and finding the foods that his doctors preferred he eat, because his food often came from food pantries.  *Id*. at 52.

---

[3] Humalog is a fast acting insulin analogue and NPH insulin (or neutral protamine Hagedorn) is an intermediate-acting insulin given to help control the blood sugar level of those with diabetes. *See* Wikipedia, NPH insulin, http://en.wikipedia.org/wiki/ (last visited February 26, 2014).

Allen explained that his high blood sugar levels of over 200 cause him to feel run down, experience blurred vision, urinate frequently, and have shooting pains and numbness in his feet and more recently in his left hand [DE 8 at 54].  He also suffers from lower back pain that has progressively gotten worse over the last few years.  *Id*. at 54–55.  He testified that he would likely only be able to sit for two hours at a time at a job like Xentel, now that his back pain has increased.  *Id*. at 55.  He did not believe he could perform his job again at Xentel because of his back, concentration, and vision problems. *Id*. at 56–57.

> 2.      *Testimony of the Vocational Expert*

Paul Malucci, a VE, testified at the hearing [DE 8 at 57–61].  The ALJ first asked the VE for a brief assessment of Allen's work history.  *Id*. at 58.  The VE testified that Allen's telemarketing position at Xentel was actually performed as sedentary/unskilled work, while the dump truck driver position with the City of Madison was medium/unskilled work, the delivery driver position at Dunham Express was medium/semi-skilled work (because it required driving skills), and the drilling position with the Department of Transportation was heavy/semi-skilled work.  *Id*. at 59.  The VE then testified that none of the skills from Allen's semi-skilled work were transferable to other sedentary work.  *Id*.

Next, the ALJ asked the VE to consider a hypothetical individual of the claimant's age, education, and work history, who was limited to performing sedentary work which precluded climbing ropes, ladders, or scaffolds, no more than occasional climbing of ramps/stairs and occasional balancing, and which precluded exposure to concentrated dust, fumes, smoke, chemicals, noxious gases, unprotected heights and

dangerous machinery [DE 8 at 59-60].  The VE testified that the individual could perform

his past work as a telemarketer, and that Allen himself had performed the telemarketing

job as typically performed within the industry.  *Id*.  The VE further stated that this was

consistent with the Dictionary of Occupational Titles.  *Id*.  The VE admitted that blurred

vision that occurred on a regular basis would make this job difficult, and noted that even

if the blurred vision was for only half an hour per eight-hour workday, the telemarketer's

productivity would be affected.  *Id*.  The VE testified that another necessary function of

being a telemarketer would be the ability to concentrate.  *Id*. at 61.

**C.     The ALJ's Decision**

First, the ALJ, John H. Pleuss, found that Allen had not engaged in substantial

gainful activity since March 16, 2009, when he applied for benefits [DE 8 at 16].

Second, the ALJ found that Allen had the severe impairment of diabetes mellitus

with diabetic neuropathy.  *Id*.  He noted that Allen was first diagnosed with insulin

dependent diabetes in 2003.  *Id*.  The ALJ also commented on Allen's complaints about

numbness and blurred vision in 2009, and indicated that Allen's eye consultative

examination in 2009 showed no evidence of diabetic retinopathy, though, did show

borderline glaucoma [DE 8 at 16–17].  Next, the ALJ mentioned in passing that Allen's

appointment with Dr. Midthun in 2010 revealed diminished sensation in Allen's feet and

left hand, and decreased air movement.  *Id*. at 17.

Third, the ALJ found that Allen did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 C.F.R.

Part 404, Subpart P, Appendix 1 ("Listings") [DE 8 at 17].  The ALJ reiterated that both

Allen and his attorney acknowledged that Allen did not meet the requirements for any of the Listings. *Id.*

The ALJ then found that Allen had the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a), except that Allen:  could only occasionally balance and climb on ramps and stairs; could never climb on ramps,[4] ladders, and scaffolding; could never perform work exposing him to concentrated dust, fumes, smoke, chemicals, or noxious gases; and could never perform any work at unprotected heights or around dangerous machinery [DE 8 at 17].  The ALJ determined that while the medically determinable impairments could be reasonably expected to cause Allen's symptoms, Allen's claims relative to the intensity, persistence, and limiting effects of these symptoms were "not credible to the extent they [were] inconsistent with the residual functional capacity assessment."  *Id.* at 19.  The ALJ asserted that substantial weight was given to the opinion of state disability medical consultant, Dr. Khorshidi, in deciding that Allen could perform sedentary work with postural limitations.  *Id.*  The ALJ explained that he took into account Dr. Midthun's assessment about Allen's decreased air movement by excluding Allen's exposure to concentrated dust, fumes, smoke, chemicals, or noxious gases.  *Id.*  And, the ALJ prohibited Allen's work around unprotected heights or dangerous machinery because of his diabetic neuropathy, which Dr. Khorshidi had confirmed.  *Id.*

At the fourth step, the ALJ found that Allen was capable of performing his past relevant work as a telemarketer, which did not require the performance of work related activities precluded by his RFC [DE 8 at 20].  The ALJ based this finding on the VE's testimony, which the ALJ found to be credible and consistent with the Dictionary of

---

[4] Inconsistency in the ALJ's opinion [DE 8 at 17].

Occupational Titles.  *Id.*  Therefore, the ALJ found that Allen was not disabled as defined by the Social Security Act.  *Id.*

## STANDARD OF REVIEW

The Commissioner's final decision in this case is subject to review pursuant to 42 U.S.C. § 405(g), as amended, which provides that, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  Substantial evidence is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It must be, "more than a scintilla but may be less than a preponderance."  *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly.  *Richardson*, 402 U.S. at 399–400.  As a result, the Court "may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled."  *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Even if, "reasonable minds could differ," about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ is not required to address every piece of evidence or testimony presented, but she must provide "an accurate and logical bridge" between the evidence and her conclusions.  *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).  Conclusions of law, unlike conclusions of fact, are not entitled to deference.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  If the Commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings.  *Id.*

## DISCUSSION

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).  Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability.  20 C.F.R. § 416.920(a)(4)(i)-(v).  The five step process asks:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  If the claimant is performing substantial gainful activity (step one), the claimant will be found not disabled.  20 C.F.R. § 416.920(a)(4)(i).  If the claimant does not have a severe medically determinable impairment or a combination of impairments that is severe and meets the duration requirement (step two), then the claimant will likewise be found not disabled.  20 C.F.R. § 416.920(a)(4)(ii).  If the claimant is not performing substantial gainful activity and does have a medically severe impairment, however, the process proceeds to step three.  At step

three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner.  20 C.F.R. § 416.920(a)(4)(iii).  In the alternative, if a Listing is not met or equaled, then in between steps three and four the ALJ must assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform his past work (step four), and whether the claimant can perform other work in society (step five).  20 C.F.R. § 416.920(e).  The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

In this case, Allen has alleged three different errors:

(1)     the ALJ had an insufficient basis for finding Allen incredible which resulted in an erroneous RFC assessment;

(2)     the ALJ made an improper step 4 assessment by finding that Allen was capable of performing his past work as a telemarketer (a decision that was based on the VE's testimony, which in turn, was provided in response to hypotheticals that contained the same limitations found in the erroneous RFC assessment); and

(3)      the ALJ failed to conduct a step 5 determination at all.  Although it is worth noting that if an ALJ properly determines that a plaintiff can perform his past work, then the ALJ need not necessarily proceed to step 5 given that the plaintiff is deemed not disabled. 20 C.F.R. § 416.920(f).  The Court agrees with Allen that the ALJ erred in each of the ways indicated.  Each issue is discussed in turn.

**A.       Whether the ALJ's Credibility Determination was Flawed & Any Effect on the RFC Analysis**

Since the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset so long as it finds some support in the record and is not patently wrong. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Indeed, "[o]nly if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (internal quotation omitted). SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). The Court should give the ALJ's opinion a "commonsensical reading," rather than "nitpick . . . for inconsistencies or contradictions . . . ." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The process for evaluating a claimant's symptoms has two major steps. First, the applicant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. 20 C.F.R. § 416.929(a) – (c). In Allen's case, the ALJ found that his medically determinable impairments could reasonably be expected to produce the symptoms alleged. [DE 8 at 18–19].

Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. 20 C.F.R. § 416.929(a) – (c). In doing so, the ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:  (1) the individual's daily

activities; (2) location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, for relief of pain or other symptoms; (6) other measures taken to relieve pain or other symptoms; (7) other factors concerning functional limitations due to pain or other symptoms. 20 C.F.R. § 416.929(c). An ALJ may not reject subjective complaints solely because they are not fully supported by medical testimony, although, that may be probative of the applicant's credibility. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).  Since "applicants for disability benefits have an incentive to exaggerate their symptoms," an ALJ is "free to discount the applicant's testimony on the basis of the other evidence in the case."  *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

In his credibility decision in this case, the ALJ found that Allen's allegations relative to the intensity, persistence, and limiting effects of his symptoms were "not credible to the extent that they [were] inconsistent with the above residual functional capacity assessment."  [DE 8 at 19].  The ALJ did not identify which of Allen's claimed symptoms he believed were exaggerated.

Allen is correct that in finding him not to be credible, the ALJ initially used the same boilerplate language which the Seventh Circuit has admonished ALJ's for using. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).  But ALJ Pleuss, unlike the ALJ in *Bjornson*, does provide some additional support for his credibility conclusion. The ALJ specifically noted that Allen had a poor work history; was not experiencing side effects from his medication; spent days looking for work in December 2009 despite claiming inability to work because of his disability; and was engaging in daily activities

in May 2009 by cleaning, caring for his personal hygiene, cooking, washing laundry and dishes, shopping at food pantries, and playing games.  The ALJ also noted that Allen's medical records revealed that his blood sugar levels improved when he was taking his medication as prescribed; Dr. Kadell opined that Allen's vision would likely be controlled if his blood sugar levels were controlled; Drs. Midthun and Khorshidi documented Allen's shortness of breath; and Dr. Khorshidi found that Allen suffered from diabetic neuropathy.  While some of the reasons provided by the ALJ to discount Allen's credibility are permitted, several of his reasons are suspect.

To start, the ALJ reasoned that Allen was not as limited by his symptoms as claimed, because he was still applying for other jobs and would spend his time searching for work.  *Id*. at 18.  But the Seventh Circuit has held that a Plaintiff's necessity to work out of financial desperation does not mean that one is actually fit to work.  *See Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998); *see also Jones v. Shalala*, 21 F.3d 191, 192 (7th Cir. 1994).  Here, there is ample evidence that Allen was not financially able to afford his medication and medically recommended diagnostic tests, that he often received free medication and supplies from his doctors and rejected further lab work on account of his financial situation, and that he was homeless and received much of his food from food pantries.  Further, no one disputes that Allen required daily monitoring and medication to keep his diabetes under control, and that when left without his medicine, his symptoms, including blurred vision, numbness to his extremities, frequent urination, and fatigue, became worse. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (The ALJ should have considered that the claimant was on public aid and could not consistently keep up with her diabetes treatment).  Given these facts, it was unreasonable for the ALJ to

outright discredit Allen's claimed symptoms and limitations because he actively sought work, when it was clear that Allen needed a job and insurance to afford a consistent medication regimen to better control his symptoms.

Similarly problematic is the ALJ's reasoning that Allen was not credible because he engaged in everyday activities such as performing chores; taking care of himself; playing games; traveling between shelters; and shoveling snow.  Although an ALJ is allowed to consider daily performance of tasks in assessing credibility, in this case, the ALJ erroneously ignored Allen's numerous qualifications regarding *how* he carried out his daily activities. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) ("An ALJ cannot disregard a claimant's limitations in performing household activities.").  In the very same May 2009 Function Report that the ALJ relied on to explain Allen's daily activities, Allen elaborated on his limited ability to perform tasks by stating:

> *I try to survive.  It[']s a real struggle* depending on where I stay, if at a friend[']s house I have to leave when he goes to work, if at a homeless shelter, when they kick you out.  I'll go to a park *where I can rest* [and] not bother any one.  If I stay at a friend[']s I'll *try* to clean-up *a little*[,] dust or vacuum his house.

(emphasis added).  [DE 8 at 182].  Allen stated that he found himself to be "very tired" at "strange times of the day and night." *Id*. at 180.  And when asked how long it takes him to make meals, Allen responded, "[n]ot long because I can't stand by the stove for any time of length[.]"  *Id*. at 184.  Allen stated that it takes him longer to get dressed, he must take breaks when doing laundry and dishes, and he needs help washing his hair and completing housework.  *Id*.  Allen also noted that his vision is always changing and he can't afford monthly exams.  Yet, the ALJ mentioned none of these limitations in discrediting Allen based on his daily activities (which one could infer were performed

without limitations from the ALJ's perspective), and such an omission was error. Moreover, unless the ALJ properly finds Allen's testimony to be incredible on remand, any such testimony about how Allen copes with his daily activities should be considered in the RFC assessment. *Craft*, 539 F.3d at 680.  Further, the ALJ should be careful not to automatically equate the ability to perform simple daily tasks with the ability to sustain daily, consistent work full-time. *See id.; see also Moss*, 555 F.3d at 562.

The ALJ also questioned Allen's credibility concerning the intensity, persistence, and limiting effects of his symptoms, because of Allen's spotty work history, noting that Allen did not work from 1997 to 2005 due to a drug addiction and was then fired from Xentel for not properly closing sales [DE 8 at 18].  Relative to Allen's termination from Xentel, the ALJ did not properly recite the record which explained why Allen was failing to close sales at Xentel.  Allen stated back in May 2009 (on the Function Report relied on by the ALJ for discerning Allen's daily activities) that Allen was terminated because he was unable to see and read what was on his monitor [DE 8 at 190].  Two and a half years later, Allen provided the same reason for his termination from Xentel by testifying that he was terminated because he had difficulties concentrating and reading the script on the monitor.  Nothing in the record disputes the reason provided for Allen's termination, yet the ALJ's opinion suggests that his termination was due to a lack of effort and thus a basis for questioning Allen's credibility.  Such a finding was not supported by the record.

The ALJ additionally found Allen's symptoms to be less limiting than he alleged because according to Dr. Kadell's August 2009 examination, Allen's vision problems could likely be controlled with medication for his high blood sugar [DE 8 at 19].  Yet, Allen testified in October 2010 that for over a month he had been regularly testing his

insulin and taking his medicine (since his supplies were recently being provided through a Lilly program) and that his typical blood sugar levels were still over 200.  Allen explained to the ALJ that having blood sugar levels over 200 resulted in his still having blurry vision, becoming easily fatigued, having to constantly urinate, and suffering from sharp shooting pains and then numbness in his feet and more recently in his fingers.  Dr. Kadell didn't have the benefit of this information in rendering his opinion, but the ALJ did.  And yet, the ALJ did not adequately explain why he believed that the actual improvement Allen did receive from regular diabetes treatment since September 2010 meant that Allen was capable of performing full time work on a consistent basis, let alone capable of performing his previous work as a telemarketer. *See Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce . . . .").  For instance, while it is true that Dr. Kadell opined that Allen's eyesight would improve with controlled blood sugar levels, there is no record evidence that the medication eradicated all of his vision problems, let alone his other symptoms or limitations.  The ALJ's failure to explain how Allen's improvement meant he was capable of performing work specifically as a telemarketer is especially problematic where the VE testified that blurred vision that lasted for only half an hour in a single workday would affect a telemarketer's productivity.

Ultimately, in evaluating the intensity, persistence, and limiting effects of Allen's symptoms to determine the extent to which his symptoms limited his ability to do basic work activities, the ALJ's overall explanation was patently wrong because he did not provide adequate reasons for discounting Allen's testimony, nor bother to explain which

symptoms he believed were exaggerated.  The ALJ's flawed credibility assessment directly influenced his RFC assessment, as evidenced by the ALJ's statement that the claimant's statements concerning his symptoms are not credible "to the extent they are inconsistent with the above residual functional capacity assessment."  [DE 8 at 19].  Because the RFC finding must be based upon all of the relevant evidence in the record, 20 C.F.R. § 416.945(a), including, among other things, "descriptions and observations of [the claimant's] limitations . . . provided by [the claimant] . . .", 20 C.F.R. § 416.945(a)(3), on remand, the ALJ must not only provide a reasonable basis for his credibility finding, but he must adequately explain which limitations he believed Allen actually suffered from despite the relief provided by his regular diabetes monitoring.  The ALJ must also sufficiently explain how Allen's believed restrictions were accounted for in the RFC finding.  And since an ALJ must consider all medically determinable impairments, even if not considered "severe," 20 C.F.R. § 416.945(a)(2), on remand, the ALJ must consider whether Allen's RFC should contain any additional restrictions given the aggregate of his aliments, including diabetes, blurred vision, frequent urination (and need for bathroom breaks), pain/numbness in his extremities, low back pain, shortness of breath, hearing loss, and lack of concentration.  The ALJ should also specify whether he is limiting Allen to unskilled labor. *See* 20 C.F.R. § 416.968.

**B.      Improper Step 4 Assessment & Hypothetical to the VE**

At step four, the ALJ found that given the RFC determination, Allen could perform his past work as a telemarketer.  The ALJ did not proceed to step five and consider whether other jobs existed in significant numbers that Allen could perform, because a finding that Allen could perform his past work required a finding that he was

not disabled. 20 C.F.R. § 416.920(f).  However, if Allen is unable to perform his past work (or if the step 4 determination was not adequately supported), then a step 5 determination is required. 20 C.F.R. § 416.920(g).  Without a proper credibility determination and RFC evaluation, step four cannot be properly analyzed. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the ALJ must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); 20 C.F.R. § 416.945(a)(5); SSR 96-8p.  In other words, because the ALJ did not provide a sufficient basis to discredit Allen's statements concerning the extent of his limitations, and because the ALJ did not explain which particular symptoms he believed Allen was exaggerating, the RFC determination is not supported by substantial evidence.  As a result, because the hypothetical questions posed to the VE contained the same limitations that were identified in the unsubstantiated RFC finding, the Court has no way of concluding whether the hypothetical questions posed to the VE ultimately included all of Allen's actual limitations.[5]

   As a result of the faulty hypothetical questions, the VE's testimony did not sufficiently establish that Allen could in fact perform his past work as a telemarketer. *See Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011) (noting that ALJ's must provide vocational experts with a "complete picture of a claimant's residual functional capacity.").  But once the ALJ poses sufficiently supported hypothetical questions to the

---

[5] Admittedly, the Seventh Circuit has occasionally assumed a VE's familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)).  This exception does not apply here, since the ALJ asked hypotheticals that focused the VE's attention on the limitations of the hypothetical person, rather than on the record itself or the limitations of the claimant himself. *Id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).

VE, then the ALJ will be in a position to rely on the VE's testimony relative to Allen's ability to perform other work.  If the ALJ properly determines that Allen cannot perform his past work, then the ALJ must assess step five of the process in order to determine if there is additional work of which Allen is capable of performing. 20 C.F.R. § 416.920(e).

## CONCLUSION

For the reasons stated herein, the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings consistent with the conclusions in this order.

SO ORDERED.

ENTERED:  March 17, 2014


_____/s/ JON E. DEGUILIO_____
Judge
United States District Court